## C. F. BOEHRINGER & SOEHNE V. A. B. RICHARDS MEDICINE COMPANY.

### No. 545.

1. **Sale by Sample—Evidence.**—In an action for the price of goods ordered and sold by sample, to which the defense was, that they did not conform to the sample, evidence is admissible to show the purpose for which defendant intended to use them, and that they would not serve that purpose, and were therefore useless to him.

2. **Evidence—Scientific Works.**—Extracts from the United States Medical Dispensatory are not admissible in evidence to show the medicinal properties and affinities of certain drugs for the price of which the action is brought.

3. **Evidence—Self-Serving Declaration.**—A letter written by plaintiff to defendant after the controversy arose, offering a compromise, and setting forth an argument of his side of the case, when offered in evidence by the plaintiff is properly rejected as self-serving and irrelevant.

4. **Sale by Sample—Right of Buyer.**—When goods are ordered by sample and do not conform therewith, the buyer is entitled to his damages in the premises whether he receives or rejects the goods; but if he elects to reject them, he must notify the seller within a reasonable time, and it is for the jury to determine what is a reasonable time under the facts and circumstances of the given case.

5. **Same—Charge of Court.**—A requested charge that the buyer must, if he rejects the goods, give the seller prompt and explicit notice, and delay in so doing is only excusable when he is prevented by overpowering obstacles, is properly refused.

6. **Same—Weight of Evidence.**—A requested charge to the effect that the jury, in determining whether the goods were accepted by the buyer, may take into consideration the length of time that elapsed before notification of rejection, and also the payment by the buyer for two previous shipments under the same order, is properly refused as being on the weight of evidence.

7. **Same—Warranty.**—In a sale by sample there is an implied warranty that the goods sold shall conform to the sample.

8. **Fact Case—Judgment Warranted.**—For facts held to warrant a judgment in favor of the seller for the goods themselves, and in favor of the buyer for so much of the price thereof as he had paid before discovering that they did not conform to the sample, see the opinion.

9. **Jurisdiction—Nonresident.**—Where nonresidents bring suit for the value of a shipment of goods, and defendants plead in reconvention to recover damages growing out of two other shipments to them made by plaintiffs under the same order, the court has jurisdiction over plaintiffs as to the entire suit, and a personal judgment against them for the damages relating to the two other shipments is authorized.

APPEAL from Grayson.   Tried below before Hon. P. B. MUSE.

*E. C. McLean,* for appellants.—1. It was error to permit the witness Cheatham to testify, over the objections of the plaintiff, as to the manner in which the quinidia was to be used in the preparation for which it was intended, as there were no pleadings in which the plaintiffs were ever informed as to the manner in which it was to be used. Express Co. v. Darnell Bros., 62 Texas, 639; Jones v. George, 61 Texas, 345; Tied. on Sales, sec. 190; 2 Benj. on Sales, sec. 993; Height v. Bacon, 126 Mass., 10; Fraley v. Bispham, 51 Am. Dec., 486; Boyd v. Wilson, 24 Am. Rep., 176.

2. It was error to not permit the plaintiffs to read to the jury from the United States Dispensatory, as it had already been proven that said work was an authority on all subjects treated on in it, and the extracts offered to be read were contradictory to the evidence of the witness Cheatham. Morris v. Gwynne, 7 Pet., 554.

3. It was error to not permit the plaintiffs to read in evidence the letter from the plaintiffs to the defendant, in which they offered to take back the last 1000 ounces delivered, as said 1000 ounces are the ones sued for in this cause, and said letter would have been evidence of an acceptance of said 1000 ounces, and should have been submitted to the jury.

4. It was error to not inform the jury as to the meaning of the term "reasonable time" as used in the charge given to the jury, and to inform them that "reasonable time" was a question of fact to be determined by them. Without instructing them that what would be a reasonable time would depend upon the nature and character of the thing to be done, the circumstances of the particular case, and the difficulties surrounding and attending its accomplishment, the jury was misled, especially as there was no dispute or conflict in the evidence as to the time. Hart v. Buillion, 48 Texas, 289; Westrope v. Chambers, 51 Texas, 178; 2 Pars. on Con., 535, 661; Wiggins v. Burkham, 10 Wall., 129; Pratt v. Farrar, 10 Allen, 519; Mitchell v. Clay, 8 Texas, 444.

5. It was error to refuse to give the first and second special instructions asked by plaintiff, as said instructions presented the true law as to the question of whether the defendant had in fact rejected the goods shipped to it by the plaintiffs, which was not in any manner presented to the jury in the charges given. Aultman v. York, 71 Texas, 261; Tied. on Sales, secs. 115–117; 2 Benj. on Sales, sec. 977; 2 Pars. on Con., 677; Spencer v. Hale, 73 Am. Dec., 309.

6. It was error to permit the judgment in this case to stand, as the pleadings and evidence show that the plaintiffs are nonresidents of the State of Texas, and the judgment against them is a personal judgment, and they have never been served with citation, nor have they answered in said cause as to the prayer for judgment in this cause against them; the only pleadings filed by plaintiffs being their original petition, in which they only submitted themselves to the court as to the matters set up in said petition, and not for any other purpose, and at least part of the judgment against them is for matters entirely

·disconnected with the subject matter of the suit. Rev. Stats., art. 650; Reno on Nonresidents, sec. 207; Brewing Co. v. Hirsh, 78 Texas, 192; Kingsbury v. Buckner, 134 U. S., 650; Duncan v. Magette, 25 Texas, 345; Fleece v. Russell, 13 Ill., 31; Reed v. Kemp, 16 Ill., 445–448.

*F. C. Dillard*, for appellee.—1. Works on medical science are not admissible as evidence, being in the nature of hearsay evidence. Railway v. Jones (Texas), 14 S. W. Rep., 309; Laws. Exp. Ev., 169, 170, 174, 178.

2. The letters of plaintiffs offered in evidence were written after a controversy arose, and were in the nature of self-serving declarations, and irrelevant to any issue in the case. Brantley v. Thomas, 23 Texas, 270; Benj. on Sales, 4 ed., secs. 893–897.

3. It was for the jury to determine from the evidence in the case what was a reasonable time within which to discover the defects in the goods, and to give notice of their rejection, and the court correctly so charged. Benj. on Sales, sec. 896.

4. The charge in relation to acceptance and notification was property refused, because on the weight of evidence. Railway v. Kutac, 76 Texas, 478.

5. Plaintiffs by voluntarily coming before the court submitted themselves to its jurisdiction for the determination of all matters that could be adjudicated in a suit of the character of the one brought by them, in the same manner as if they were residents of the State of Texas. 1 Sayles' Civ. Stats., art. 645; York v. The State, 73 Texas, 651.

LIGHTFOOT, CHIEF JUSTICE.—On July 17, 1891, C. F. Boehringer & Soehne, a partnership, of New York City, filed its petition against the A. B. Richards Medicine Company, a partnership, of Sherman, Texas, to recover from defendant the sum of $850, and interest, alleged to be due for the purchase of certain goods, wares, and merchandise. The merchandise referred to in the petition was quinidia. On July 17, 1891, defendant answered, alleging, that about April 20, 1890, it ordered from plaintiffs about 3500 ounces of quinidia pure, a sample of which was furnished to plaintiffs, and goods ordered were to correspond with sample; that the price paid was 85 cents per ounce for a part of the quinidia; and 95 cents per ounce for the remainder; that a short time after the order was given, plaintiffs, pretending to comply with it, sent 3500 ounces of quinidia in different shipments, and that defendant, upon receipt of the same, and before it had an opportunity to examine the goods, paid plaintiffs the sum of $2275; that as soon as defendant had an opportunity to examine the quinidia, and within a reasonable time after receiving it, it discovered it did not comply with the sample, but was of much less value, and immediately notified plaintiffs of the fact, and that it held the quinidia subject to their order, and demanded of them the money already paid. The answer further alleged, that the articles sent by plaintiffs was wholly worthless, could

not be used by defendant at all, and was of absolutely no value either in the market or to defendant; that if the order had been complied with, the quinidia would have been worth at least $1.25 per ounce in Sherman, Texas, the place of its delivery.

On March 31, 1892, the case came on for trial, and resulted in a verdict and judgment that the quinidia was the property of plaintiffs, and that defendant should recover of them the sum of $2468.38, with interest from date of judgment—being the amount already paid by defendant, with interest thereon—from which judgment this appeal is taken.

The facts will fully appear under the different assignments of error considered.

1. Appellant's first assignment of error is as follows: "It was error in the court to permit the witness Cheatham to testify, over the objections of plaintiffs, as to the manner in which the quinidia was to be used in the preparation for which it was intended, as there were no pleadings in which the plaintiffs were ever informed as to the manner in which it was to be used, as shown by bill of exceptions number 1."

The testimony of the witness Cheatham, objected to as shown by the bill of exceptions, was to the effect, "that the quinidia was intended by defendant to be used in the preparation of a patent medicine, known as Cheatham's Chill Tonic, and that it was intended that the quinidia should not be dissolved in the liquid, but was to be held in solution, and that if the grains were large the quinidia would float more readily, and that when shaken up so as to be held in solution, the crystals would scratch the throat; whereas, if in fine crystals, they would be disseminated through the mass of the liquid, and the same amount would be taken in each dose; that if the quinidia was dissolved in the liquid it would be bitter to the taste; whereas, when held in solution, it would not affect the taste, and the remedy could be taken without tasting the bitterness of the quinidia."

It was shown by the pleadings of the defendant, that in ordering the quinidia it had sent a sample of the kind desired, and it was shown that appellants were notified before the sale that unless the quinidia conformed to the sample it was not desired. It was shown both by the pleading and testimony that it did not conform to the sample, and was useless to appellees.

The sample of quinidia sent to appellants, and upon which the contract was made, was of fine or small crystals, and the quinidia shipped to appellee was of much larger crystals. The goods were such as are limited in use, not usually kept in stock in any quantity, and principally used in the preparation of patent medicines. The size of the crystals do not affect the purity of the article, but the practical use of the article is very greatly affected. The testimony of the witness, Cheatham, objected to in this assignment, tended to show, that the quinidia with crystals of the size in the sample could have been used, but with crystals of the size shipped, could not be used, but was wholly worthless. The testimony was admissible. The same testimony

practically was given by witness A. B. Richards, and was not objected to by appellants.

2.   Under the second assignment, appellants complain that they were not allowed to read as testimony a portion of the United States Medical Dispensatory, under the title:   "Quinidinæ Sulphas—Sulphate of Quinidine"—showing the discovery of the article, and its medicinal properties and affinities.  It was objected to by appellee, on the ground that such works are merely hearsay, and are not admissible as evidence of the statements therein contained, and that the article in question was quinidia pure, which was not shown to be quinidinæ sulphas, or sulphate of quinidine, which objections were sustained.

Without attempting any scientific discussion of the difference between quinidia pure and sulphate of quinidine, it is enough to say that the testimony, not being the statement of any witness under oath, or of any documentary evidence permitted or required by law to be received as testimony, but simply the theory of a writer or writers concerning medical science, reduced to writing and printed in book form, the same was not admissible as evidence, and was properly excluded.

The leading authorities cited in appellants' argument and urged upon the court, is an article in the American Law Review for May and June, 1892, page 390.   A close inspection of the article shows that the writer admits that the established rule forbids the admission of such testimony.   He says, at the outset:   "It is to *the dethronement of this rule* that the efforts of both the medical and legal professions should be directed, and the object of this article is to suggest the arguments for its abolition."

In a note he says, "the rule may be spoken of as a general one." In this he is sustained by the authorities.   Railway v. Jones (Texas), 14 S. W. Rep., 309; Lawson on Ev., pp. 169, 170, 174, 178;  Whart. on Ev., 665; Ashworth v. Kittridge, 12 Cush. (Mass.), 193.   In the last named case, Chief Justice Shaw says:   "But upon the other point, the court are of opinion, that it was not competent for the counsel for the plaintiff, against the objection of the other side, to read medical books to the jury.   It was formerly practiced rather by general indulgence and tacit consent of parties than in pursuance of any rule of law; but it has been frequently decided that it is not admissible, and we now consider the law to this effect well settled, both upon principle and authority.   Where books are thus offered, they are in effect used as evidence, and the substantial objection is, that they are statements wanting the sanction of an oath; and the statement thus proposed is made by one not present, and not liable to cross-examination.   If the same author were cross-examined, and called to state the grounds of his opinion, he might himself alter or modify it, and it would be tested by a comparison with the opinions of others.   Medical authors, like writers in other departments of science, have their various and conflicting theories, and often sustain and defend them with ingenuity. But as the whole range of medical literature is not open to persons of

common experience, a passage may be found in one book favorable to a particular opinion, when perhaps the same opinion may have been vigorously contested, and perhaps triumphantly overthrown, by other medical authors, but authors whose works would not be likely to be known to counsel or client, or to court or jury. · Besides, medical science has it own nomenclature, its technical terms and words of art, and also common words used in a peculiar manner, distinct from their received meaning in the general use of the language.    From these and other causes, a person not versed in medical literature, though having a good knowledge of the general use of the English language, would be in danger, without an interpreter, of misapprehending the true meaning of the author. ''

The reasoning of Chief Justice Shaw could not be better illustrated than in the complex and technical excerpts sought to be introduced in this case from the United States Medical Dispensatory. · It may be well doubted whether the learned counsel who sought to introduce them, or the court, could satisfactorily analyze ''quinidinæ sulphas, or sulphate of quinidine,'' or show its scientific relation to quinidia pure; and the jury should not be required to undertake the task with such testimony.

We prefer to follow the established rule, which seems to be based upon sound reason, and has received the sanction of the courts since the time of Lord Tindal, rather than the arguments of those who seek ''the dethronement of this rule. ''   The article in the Review makes some strong suggestions for the consideration of the legislative department, but they were evidently not intended as authority for the courts.

3.   The appellants offered in evidence a letter written by them to appellee after the controversy arose, in which they offered to settle the controversy by taking back the last 1000 ounces of quinidia shipped, and setting forth an argument of their side of the case.   This letter was properly excluded, as it was written after the controversy arose, was an offer of compromise, was self-serving, and not relevant to any issue in the case.

4.   The fourth, fifth, and sixth assignments of error object to the following charge of the court:   ''2. If, however, you believe that the drug so purchased was to be quinidia pure, and in accordance with and to correspond with a sample furnished plaintiffs by defendant, and if you find that plaintiffs shipped to defendant quantities of quinidia, and that defendant received the same, and within a reasonable time thereafter made an examination thereof; and if you believe that the drugs so received by defendant did not correspond to such sample and were inferior thereto, and that defendant thereafter within a reasonable time notified the plaintiffs that it would not receive such goods, then under such circumstances defendant would not be liable for the drugs, and under such circumstances the drugs would be the property of the plaintiffs, and under such a state of facts the defendant would be entitled to recover of plaintiffs whatever sum the evidence shows you

was paid by defendant to plaintiffs, with interest thereon from the date of such payment to this time at 6 per cent per annum.   On the other hand, if you believe that the bulk of the quinidia did not correspond with or equal the sample, if any, and if you believe that defendant received such goods, and that it did not within a reasonable time notify plaintiffs that such quinidia did not equal or correspond with the sample, then under the said circumstances such goods would be treated as the property of the defendant, and under such circumstances defendant would be entitled to the difference between the price agreed on and the reasonable market value of the goods received at the time and place of the delivery; and if under this state of facts the defendant has paid plaintiffs more than plaintiffs, under the rule just above stated, would be entitled to, then it should recover it back; but if under such rule you find that plaintiffs have not been compensated, then you should find for plaintiffs.   The phrase 'reasonable time' is a question of facts to be determined by you under all the facts and circumstances of the case."

This charge was a full and clear submission of the issues involved, and is not open to the criticisms made upon it by appellants.

5.   The seventh assignment is upon the omission of the court to define to the jury what was "a reasonable time."   If this charge was not full enough, the omission should have been supplied by a special charge requested upon that subject.   But the question of what is a reasonable time within which a purchaser must reject goods not in compliance with contract, is a question of fact, governed by the circumstances of each particular case; and the court properly left it to the jury.

6.   In the eighth assignment, appellants complain that the court refused to give the following instructions:

(1) "The court is requested by the plaintiffs to charge the jury, that the buyer must, if he rejects the goods, give the seller prompt and explicit notice of his rejection, and delay in so doing is only excusable when he is prevented by overpowering obstacles.   And it is for the defendant to show you by evidence the cause of delay, if any, in notifying plaintiffs of his rejection.

(2) "Where the right of rejection is exercised, based upon facts that were discoverable on receipt of the goods, the right of rejection must be exercised at the time of delivery."

There is no rule requiring "overpowering obstacles" to excuse delay in rejecting goods.   When goods are sold by sample, and sent by the vendor as a compliance with the contract, if they are not the goods ordered, the vendee can take either of the two courses:  He can reject the goods, and sue for damages for the failure of the seller to comply with the contract; or he can take the goods, and sue for damages— and the measure of damage, in the absence of any consequential damage, is the difference between the value of the goods received and those for which he contracted.   If the buyer rejects the goods, he

should do so promptly. He should examine them and notify the seller of his rejection within a reasonable time; otherwise, he will be held to have elected to keep them, and can only recover the difference between the value of the goods received and the goods contracted for. The charge of the court as given fairly presented this issue to the jury, and there was no error in refusing the requested charges. Brantley v Thomas, 22 Texas, 275; Whitaker v. Hueske, 29 Texas, 355; Benj. on Sales, secs. 652, 652a; Story on Sales, sec. 138.

7. The following instruction was asked and refused, upon which the ninth assignment is based: "If you believe from the evidence that the defendant accepted the goods when delivered, you will find for the plaintiffs. You may, in determining whether the goods were accepted, take into consideration the length of time that elapsed before notification of rejection, and also payment for the two shipments."

The first clause of this requested charge would not be proper without qualification. The goods having been sold under an express agreement that they should conform to the sample, and the vendors having notice that they would be valueless to the vendee unless they did conform to sample, there was an implied warranty of such conformance by the sellers. If the defendant accepted the goods when delivered, *and they complied with the contract*, then the plaintiffs would be entitled to recover; but if defendant accepted them believing that they conformed to sample, and afterward discovered that they did not comply with the contract, plaintiffs would be entitled to the value of the goods, and defendant could recoup in damages for the difference between the value of the goods contracted for and those delivered.

The last clause of the requested charge was upon the weight of the evidence. The charge was properly refused. Blythe v. Speake, 23 Texas, 428; Jones v. George, 61 Texas, 345; Aultman v. Hefner, 67 Texas, 61; Brantley v. Thomas, 22 Texas, 275; Benj on Sales, secs. 894, 897, 899.

The last quoted authority says: "That the buyer may, after receiving and accepting the goods, bring his action for damages in case the quality is inferior to that warranted by the vendor, needs no authority."

8. The tenth assignment attacks the verdict of the jury and judgment thereon, as not being supported by the facts. It was clearly shown by appellee that the quinidia was ordered by sample, and express notice given that if it did not conform to the sample sent by the buyers, that it could not be used; that the goods did not conform to the sample, and were utterly worthless to appellee, and could not be used in the Sherman market. The appellants did not attempt to show any market value for the goods in Sherman, but their own witness testified, that the goods were of very limited sale and only in small demand anywhere. Mr. Emil Levi, appellants' salesman, testified: "We have never sold any quinidia pure to anybody in the United States, as far as I can recollect. The article has such a limited sale that we do not even keep it in stock. I do not think that we could

sell fifty ounces of quinidia pure at a time to any wholesale druggist in the United States for prescriptions, unless he made a similar patent medicine as Mr. Richards of the defendant. I only know of two or three firms in the United States who use the article, I believe in patent medicines only." * * * If the testimony of this witness is true (and it is not disputed), it tends to support the theory of the appellee, that there was no market value for the goods in Sherman, and it was therefore worthless to appellee. This being true, and the testimony of appellee having shown (without dispute), that if the quinidia had conformed to sample it would have been worth to them in Sherman $1.25 per ounce, the verdict and judgment fixing the damage of appellee at the amount it had paid to appellants, was as little as could have been awarded, taking any view of the case, whether the goods had been received by appellee or rejected.

The fact that the goods were awarded to appellants in the verdict and judgment, if error, was certainly one of which they should not complain, in view of the fact, that without giving appellants the goods, the undisputed evidence shows that appellee would have still been damaged to the full amount awarded. In this view of the case, the question whether the goods were rejected within a reasonable time is of little importance. But in any event, the question was fairly submitted to the jury by the charge of the court, and we do not feel authorized to disturb their finding. We think the justice of the case was reached.

9. The eleventh assignment of error raises the question, that appellants are nonresidents of the State of Texas, and being in court only upon the cause of action brought by them for the purchase price of only one shipment of quinidia, that no personal judgment was authorized against them for damages growing out of other shipments which were separate and distinct. This contention is without merit. Appellants having voluntarily submitted themselves to the jurisdiction of the courts of this State, and the cause of action pleaded by appellee in reconvention being one which it could properly plead under our practice, the judgment was properly rendered. Appellants introduced testimony, cross-examined appellee's witnesses, and requested special charges to the jury upon the cause of action set up in appellee's plea in reconvention, fully contesting the same upon all parts of the ground, and filed a motion for new trial below, based on such issues. They can not now be heard to say they were not in court upon the issues there presented. 1 Sayles' Civ. Stats., art. 645; York v. The State, 73 Texas, 651.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

Delivered December 5, 1894.