13210

EDWARDS v. UNION BUFFALO MILLS CO. *ET AL.*

(159 S. E., 818)

18

*Messrs. Hughes & Russell* and *Elliott, McLain, Wardlaw & Elliott,* for appellants,

*Messrs. Barron, Barron & Barron* and *John K. Hamblin,* for respondent,

July 28, 1931.

The opinion of the Court was delivered by MR. JUSTICE BONHAM.

Plaintiff alleges in her complaint that at the time therein named she was employed by the defendant Buffalo Mills Company in the weave room of its mill situate at Union, S. C. Her duties were to fill batteries of certain looms in that weave room. While so engaged, she alleges that she was struck in the back by a shuttle "that flew from one of the looms near by." That she was struck in her back, and backbone, and other parts of her back, thigh, and legs; was immediately permanently injured, in her back, spinal cord, nerves, and ligaments, and suffered great pain and anguish of mind and body; is threatened with paralysis; is unable to work, and has no hope of full recovery. That her injuries were due to defendants' negligence, willfulness, and wantonness in the particulars set out in the complaint. Judgment is asked for in the sum of $100,000.00.

Defendants for answer, after admitting the formal allegations of the complaint, admit that plaintiff was slightly in-

jured, but deny that the injury was serious, or that it was of a permanent nature. They also plead assumption of risk.

Defendants at the conclusion of the testimony moved for a directed verdict in their favor on the grounds that there was no proof of negligence; no proof of failure to furnish a safe place to work, and safe appliances with which to work, and that the proof showed that the alleged injury is such as would be assumed as an incident of the employment.

The motion was overruled. The jury found for plaintiff in the sum of $30,000.00.

Motion for new trial was made upon the grounds set out in the transcript of record, which are too long to reproduce here, but such of them will be considered as we deem pertinent and material.

Some of the exceptions challenge the correctness of the rulings of the presiding Judge in refusing to continue the case on motion of the defendants on the ground of absent witnesses.

It is established law in this State that the matter of continuance rests in the sound discretion of the presiding Judge, and his ruling will not be interfered with unless there is a clear showing of abuse of that discretion. In this instance the statements of the absent witnesses were admitted by opposing counsel and were used in evidence. There was abundant testimony by other witnesses to the matters and things about which the absent witnesses would have sworn if they had been present, so their testimony would have been merely cumulative. We cannot say there was an abuse of discretion in denying the motion for continuance.

Other exceptions allege error in refusing the motion of defendants for directed verdict. We think there was no error. There was evidence by the plaintiff and her witnesses sufficient to take the case to the jury on the issues of negligence in the matter of a safe place to work, and safe appliances with which to work.

One of the serious questions in the appeal arises in connection with those exceptions, which are predicated upon the charge that plaintiff's counsel was permitted to read to the jury from a medical book after the Court had ruled that it was inadmissible; and that counsel was allowed to use in argument to the jury the testimony he had read from the excluded book. Upon objection by defendant's counsel to this argument the Court merely admonished the plaintiff's counsel to keep to the evidence. The jury were not instructed to disregard the argument based upon the excluded book. Nor did the Court's admonition avail to cause counsel to refrain from this line of argument. So that the plaintiff had the benefit of the evidence of the excluded medical book as fully as if it had been admitted. Thus the question whether a medical book may be read to the Court, or in examination of a witness, or directly to the jury in argument, is squarely presented.

The sharp issue in the case was whether plaintiff was really injured as claimed, or if she was the subject of hysteria, and the victim of her nerves and imagination. Two doctors had testified in behalf of plaintiff to the effect that her injuries were real and permanent. Other doctors testified in behalf of defendants to the effect that plaintiff was the victim of hysteria, that her condition was brought on by her own actions, and that they were not of a permanent nature. And around this divergent testimony the issue ranged.

It appears from the transcript that after the objection by defendant's counsel and after the Court had said, "Better ask him the direct question," counsel continued to read from the medical book of Dr. Osler. Folios 556-564 of Transcript.

This occurred while plaintiff's counsel was making his argument to the jury:

Mr. Barron: "I had more than two doctors, I had Dr. Osler. That knocked them off their feet."

Mr. Hughes: "One minute, your Honor, under the law of this State medical books are not evidence in this case, and

counsel has no right to argue it to the jury, and we object to it."

The Court: "Yes, sir; better confine yourself to the evidence, Mr. Barron."

Mr. Barron: "I showed Dr. Switzer the book and he said it was authority."

Mr. Hughes: "One minute, your Honor, that cannot be referred to as evidence in this case."

Mr. Barron: "If your Honor please, he is taking up the time I have for argument."

Mr. Hughes: "You are responsible for it."

Mr. Barron: "I am arguing the facts in this case."

If it was error for counsel thus to refer to the excluded medical book, it was not cured by the mild admonition of the Court which went unheeded by counsel.

May medical books be read to the witnesses, or to the Court, or to the jury? To read such a book to the Court or the jury is to make of the author of the book a witness for the party introducing it, which witness the other party has no opportunity to cross examine. In addition, it is hearsay testimony.

Section 744, Code Civil Procedure S. C., 1922, is as follows: *"Medical or Scientific Books—In What Causes May Be Read.* In all actions or proceedings, civil or criminal, in which the question of sanity or insanity, or the administration of poison or other article destructive to life, is involved, and in which expert testimony may now be introduced, the medical or scientific works, or such parts thereof as may be relevant to the issues involved, shall be competent and admissible to be read before the Court, or jury, in addition to such expert testimony."

The fact that the General Assembly found it necessary, by a special enactment, to authorize the reading of medical or scientific books, in cases involving insanity or the administration of poison or other deadly articles, is unanswerable proof of its intention that such books should not be read to

the Court, or jury, in other classes of cases. The maxim, *"Inclusio unius est exclusio alterius,"* is especially applicable here.

Such books may legitimately be used by counsel upon which to frame hypothetical questions, but may not be used as testimony.

We take the following from 22 C. J., pp. 210, 211: ■ *"Printed Hearsay:* A hearsay statement does not become competent by reason of the fact that it is printed, even though it appears in the responsible form of a book, and even though such book is a treatise by an author of standard authority on a scientific subject, *such as a medical treatise."* (Italics added.) The editor fortifies his statement with numerous authorities from many states. The United States Medical Dispensary has been excluded. *Boehringer v. Richards Medicine Co., 9* Tex. Civ. App., 284, 29 S. W., 508. *"Admission cannot be secured indirectly* by asking a medical expert whether extracts read to him from such a treatise are accurate statements of the facts." *Davis v. State,* 38 Md., 15; *Marshall v. Brown,* 50 Mich., 148, 15 N. W., 55. "Nor is it an available expedient to attempt to corroborate a medical witness by showing that such a treatise sustains his position." *Fox v. Peninsula White Lead, etc., Works,* 84 Mich., 676, 48 N. W., 203; *Huffman v. Click, 77* N. C., 55. Note to 22 C. J., 211.

In Wigmore on Evidence, Vol. 3, p. 1690, discussing the exceptions to the hearsay rule, the author says this:

"This exception is usually spoken of as involving the use of 'scientific books' or 'books of science and art' or 'medical books'; but the term 'learned treatise,' seems more accurate in indicating the scope of the doctrine. As an exception to the hearsay rule it has obtained complete recognition in only one or two jurisdictions; but it deserves a fuller acceptance, and the precise bearings of the reasons for and against it deserve careful consideration.

"More than one reason has been advanced for prohibiting the use of learned treatises in evidence; but the only legitimate one, and the one pointed out and relied upon in judicial opinions, is that such offer of evidence purports to employ testimonially a statement made out of Court by a person not subject to cross examination: *i. e.;* purports to violate the fundamental doctrine of the 'Hearsay Rule.' "

The learned author then proceeds to give his reasons for the opinion that this exception might be given wider acceptance. But he admits that it has not been so accepted. Indeed, he says it has been completely accepted in only one or two jurisdictions.

Finally, he says, Section 1700: *"That counsel may read to the jury learned treatises is regarded, as allowable in one jurisdiction at least; in effect the treatise is thus used evidentially. In a few jurisdictions a hazy distinction is made between their use as "illustration" and their use as evidence, the former being sanctioned. But the general opinion discountenances any such uses."*

The matter is concluded in this State by our Code of Civil Procedure, § 744, hereinabove quoted.

"Scientific Books Evidence." "In an extrajudicial search for the State of professional opinion as a scientific topic, the most natural resort is to the standard treatise on the subject. But the caution of the Courts in admitting opinions which are not based on the observation of the particular facts of the case, the universal requirement that the testimony given to a jury should be under the sanction of an oath, and subject to the test of a cross examination, and the probability of misleading a jury by reading to them general statements to which they are hardly competent to apply the necessary qualifications and distinctions, have led to a more or less general refusal of Courts to permit scientific treatises, *particularly medical works* (italics added), to be proved as standard books of authority and extracts therefrom to be used as opinion evidence." 11 R. C. L., pp. 588-589.

It was harmful error to permit counsel to read from a medical book, which error was emphasized when he continued to use the testimony thus obtained in his argument, in spite of the objection of counsel and the admonition of the Court.

It is made a ground of exception that his Honor, the presiding Judge, erred in not granting a new trial for that plaintiff's counsel referred in his argument to a paper alleged to have been signed by Dr. Payne, which paper had been excluded from the evidence. When defendant's counsel objected to this reference, plaintiff's counsel said:

"She said she was treated by Dr. Payne and we offered this paper in evidence."

Mr. Hughes: "We object, your Honor, that paper was offered in evidence and was ruled out, and we object to counsel referring to it."

The Court: "Yes, sir; leave out the paper, Mr. Barron."

Mr. Barron: "I showed them this paper and they objected to it."

Counsel was not justified in referring to the paper in the first instance; the error was made the greater by his repetition of the reference after the Court had told him to leave it out. The colloquy was well calculated to induce in the minds of the jurors the impression that there was in this paper something especially helpful to plaintiff and hurtful to defendants.

Exception is made that "plaintiff's counsel transcended all rules of fairness in having the jurors trying the case to leave their seats and examine plaintiff's leg, stick pins in it, etc., thereby making witnesses out of the jurors."

Such practices are not to be commended. The jurors should occupy a wholly detached attitude, but we do not think this action calls for a reversal of the judgment.

It is made an exception that his Honor erred in not granting a new trial for the reason that plaintiff's counsel transcended the rules of fair argument by

using the following language in his argument to the jury: "I am casting no reflections on the doctors, but I think it was one distinguished Chief Justice who said, that there are two classes of liars. One, he said, is the plain liars, and the other is the experts. Don't take that literally; I don't mean that, but I do mean that when you have money you can line up doctors on one side and doctors on the other, as many as you want to and they will try to out-swear each other. You know it, you read it in the papers."

It is readily conceivable that in the zeal of argument counsel may say harsh things of witnesses who have testified against his cause. If there is evidence to support it, allowance may well be made for the intemperance of the language. But there is no palliation when counsel, without foundation in the evidence, asperses the integrity and veracity of respectable witnesses. We have read with special care the voluminous testimony contained in the transcript of record in this case, and we cannot find anything which justifies the suggestion made to the jury in the argument of plaintiff's counsel that the doctors who testified as defendants' witnesses were liars or men who had been bought, or could be bought, by the money of the defendants.

In the case of *State v. King,* 158 S. C., 285, 155 S. E., 409, 421, Mr. Justice (now Chief Justice), Blease said this: "In the recent case of *State v. Kennedy,* 143 S. C., 318, 141 S. E., 559, we held: ' * * * Uncalled for personal abuse of a witness by counsel is objectionable, and will not be condoned or allowed by the Court.' If the record in any case shows that this salutary rule has been violated, and the effect was, in this Court's opinion, to prevent one charged with crime from having the fair and impartial trial, guaranteed to him under the Constitution of this State, this Court will exercise its power to uphold the Constitution by reversing the case, with the purpose of giving a defendant the trial to which he is entitled."

This "salutary rule" applies with equal force to cases on the civil side of the Court. In fact, to the same effect is the opinion of the Court in *Kirby v. Telegraph Co.,* 77 S. C., 409, 58 S. E., 10, 12, 122 Am. St. Rep., 580. There the Court says: "Another fact which must not be overlooked is that there seems to be a tendency at the present day to hold corporations to strict accountability for their acts. Any language which tends to fan this natural feeling into greater fury, 'flights of oratory' though it be, certainly has its weight and should be avoided. Courts are for the purpose of dispensing justice, and, were this kind of language allowed, in many cases that purpose might be defeated. *Where the record does not sustain the remarks made* [italics added], if it is evident that harm does result from them, it seems that this Court should exercise its power and grant a new trial. We think the language here used was highly prejudicial to the defendant, and therefore sustain the exception."

In that case the language complained of was less objectionable than that complained of in this case. "Counsel for the defendant was criticized for defending in so plain a case. This also was error. The guilty are entitled to be heard by counsel." *State v. Atterberry,* 129 S. C., 472, 124 S. E., 648, 651. "Failure of the Court emphatically and effectively to correct or remove the influence of a statement by the prosecuting attorney characterizing accused as a perjurer before the jury is reversible error." *State v. Moran,* 99 Conn., 115, 121 A., 277, 36 A. L. R., 862.

In *Dannals v. Sylvania Township,* 255 Pa., 156, 99 A., 475, 477, 4 A. L. R., 409, counsel for plaintiff referred to one of defendant's witnesses as a "drunkard" and "guttersnipe." The Supreme Court of Pennsylvania said this about it: "But there are certain kinds of objectionable remarks which have been held to be so prejudicial in their nature as to be beyond correction by any admonition the Court may give the jury to disregard them." Citing *Lopresti v. Sulkin,* 49 Pa. Super. Ct., 417.

Continuing from the *Dannals case:* "Witnesses are entitled to the protection of the Court. It was not enough for the trial Judge to characterize the remarks as highly improper, and to instruct the jury to disregard them. The only effective method of correcting the mischief was to withdraw a juror and continue the case." The judgment in favor of plaintiff was reversed.

In the annotation to the *Dannals case* the editor lays down as a general rule the following statement, which he supports with the citation of many authorities from a number of states: "Uncalled-for personal abuse by counsel of witnesses, whether during the course of examination or in his argument before the jury, when calculated to inflame the passions of the jury and materially prejudice the case adversely to the party complaining, if allowed to go uncorrected by the Court, will afford ground for a reversal."

In *Sutton v. Chicago, St. Paul, M. & O. R. R.,* 98 Wis., 159, 73 N. W., 993, it was held that repeated statements by counsel in examination of a witness, that he had been "handled" by defendants, was held to be reversible error.

In an action for personal injuries it has been held to be error for counsel for plaintiff in alluding to physicians employed by defendant railroad company, as "hirelings" and denouncing one of them by the name of Arnold as "Benedict" Arnold. *Mott v. Detroit, G. H. & M. Co.,* 120 Mich., 127, 79 N. W., 3.

In *Eagle, S. & B. D., Ins. Co. v. Heller,* 149 Va., 82, 140 S. E., 314, 323, 57 A. L. R., 490, the Supreme Court of Virginia said this: "We have frequently had occasion to allude to this bad habit of too many attorneys, who in the excitement of the contest ignore or forget that in a tribunal engaged in the investigation and determination of facts upon which the rights of litigants depend, passion, prejudice, and vituperation have no proper place; that the privilege and highest duty of counsel should be to aid the Court and the jury by accuracy, learning, reason, and persuasion to in-

terpret the evidence so as to ascertain the truth; and that violent denunciations are a hindrance and not an aid thereto, which should not be permitted in a Court of justice. The trial Courts should firmly and unflinchingly restrain such indulgences. When they fail to do so and verdicts are induced thereby, they will and should be, set aside." The judgment was reversed.

It does not permit of argument that the language complained of in the case under review was highly prejudicial, calculated to arouse the prejudices of the jurors, and did undoubtedly contribute to induce the verdict which was rendered.

Defendants also appeal from the order of the trial Judge settling the case for appeal. In the disposition which we have made of the case it is not necessary to consider the questions thus presented.

For the reasons hereinabove assigned, the judgment of the Circuit Court is reversed, and the case remanded for a new trial.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES COTHRAN, STABLER and CARTER concur.