13216

BAKER v. SOUTHERN COTTON OIL CO. *ET AL.*

(159 S. E., 822)

480

*Mr. Randolph Murdaugh,* for appellants,

*Mr. George Warren,* for respondent,

August 1, 1931.

The opinion of the Court was delivered by Mr. Justice Bonham.

The respondent, Mrs. Esther Baker, is the mother of Edward Baker, who is a deaf mute of about eight years at the times with which this action is concerned. In September, 1929, she, as guardian *ad litem* of Edward Baker, brought this action, the object of which is to recover damages which it is alleged the infant Edward Baker suffered through the negligent, willful, and wanton acts of the defendants the Southern Cotton Oil Company and Jack Aldridge, its servant and employee, under the circumstances set out in the complaint. Only the oil company and Jack Aldridge were served, and they are appellants.

The complaint alleges that the oil company with its servant and employee, Jack Aldridge, and other servants and employees, was repairing and replacing the roof on the hotel in the town of Estill; that the hotel adjoins the premises occupied by the parents of Edward Baker; that on the 14th or 15th day of May, 1928, while engaged in repairing the roof of the hotel, the oil company through its servants and employees, including Jack Aldridge, threw or dumped, or had thrown or dumped, into the yard of the parents of said Edward Baker, where he was at play, concrete or other hard substance which struck him, by which blow he was paralyzed for sometime, suffering great physical and mental pain, and by which he was permanently injured in his head and mind. The prayer of the complaint is for $40,000 actual and punitive damages.

The defendants Southern Cotton Oil Company and Jack Aldridge answered denying each and every allegation of the complaint. The case was tried before Judge Townsend and a jury at the October, 1930, term of the Court for Hampton County and resulted in a verdict for plaintiff in the sum of $5,000.

At the close of all the testimony the defendants moved for a directed verdict in their favor on the grounds that there was no proof of willfulness, and that there was no evidence that the oil company had on the building· the pieces of substance introduced in evidence as the substance which hit the plaintiff; and that there was a total lack of evidence that the defendants Southern Cotton Oil Company or Jack Aldridge threw any substance which hit the plaintiff. The Court granted the motion as to willfulness and refused it otherwise.

After the rendition of the verdict, a motion for new trial was made on the grounds that the evidence was susceptible of no other conclusion than that the defendants did not throw whatever substance struck Edward Baker; that it was prejudicial error to allow plaintiff's attorney to read from a medical book concerning matters which were not pertinent to the evidence and facts of this case; that the· verdict was contrary to the evidence and was capricious; that the verdict was excessive.

The motion was denied. Thereafter a motion was made for a new trial on after-discovered evidence, which was denied.

Then followed the appeal, which by seven exceptions ascribes error: In permitting plaintiff's counsel to read from a medical book; in not granting the motions for directed verdict and for new trial which were based upon the propositions that there was a lack of any evidence that there was on the roof any such substance as that which was introduced in evidence as the substance that struck Edward Baker; or that any such substance was thrown from the building; or that Jack Aldridge or·the Southern Cotton Oil Company threw any substance from the building which struck Edward Baker; in that the verdict was against the greater weight of the evidence, was capricious, excessive, and not supported by the evidence in any way; in that it was error to refuse the motion for new trial made on after discovered evidence.

As the case must go back for new trial, we shall not discuss those exceptions which challenge the force and sufficiency of the evidence.

The first and fourth exceptions charge that it was ▌ error to permit plaintiff's counsel to read from a medical book, particularly those citations which had no relevancy to the facts of the case being tried.

The question whether it is permissible, in this State, to read to the Court, or the jury, or to witnesses on examination, from medical books, has just been considered and decided by this Court in the case of *Katie Bell Edwards v. Union Buffalo Mills Company,* 162 S. C., 7, 159 S. E., 818. And the conclusion reached is that it is not so permissible.

It would seem that the question is set at rest in this State by the express provisions of Section 744, Code Civil Procedure 1922, which section is in these words: *"Medical or Scientific Books—In What Cases May Be Read.* In all actions or proceedings, civil or criminal, in which the question of sanity or insanity, or the administration of poison or other article destructive to life, is involved, and in which expert testimony may now be introduced, the medical or scientific works, or such parts thereof as may be relevant to the issues involved, shall be competent and admissible to be read before the Court, or jury, in addition to such expert testimony."

If it were the law in South Carolina that medical books could be read before the Court and jury, it would not have been necessary for the Legislature, by special enactment, to provide that such books might be read in two certain classes of cases. The restriction of their use to such cases is irrefutable argument that they cannot be used in any other cases.

The maxim, *"Inclusio unius est exclusio alterius,"* applies with special emphasis and aptness here.

There is other authority to show that the general rule is that medical and other scientific works, or, as Prof. Wig-

more prefers to call them, "learned treatises," are not admissible in evidence, nor competent to be read before the Court and jury. The proper use of them is as a basis of hypothetical questions.

We shall call Prof. Wigmore himself an authority. While he argues that there might well be a wider latitude in the use of such "learned treatises," nevertheless he admits that such latitude is allowed in only one or two jurisdictions, and that the general rule is as we contend.

Discussing the question of exceptions to the "Hearsay Rule," he says:

"This exception is usually spoken of as involving the use of 'scientific books' or 'medical books' or 'books of science and art'; but the term 'learned treatise' seems more accurate in indicating the scope of the doctrine. As an exception to the hearsay rule it has obtained complete recognition in only one or two jurisdictions; but it deserves a fuller acceptance, and the precise bearings of the reasons for and against it deserve careful consideration.

"More than one reason has been advanced for prohibiting the use of learned treatises in evidence; but the only legitimate one, and the one pointed out and relied upon in judicial opinions, is that such offer of evidence purports to employ testimonially a statement made out of Court by a person not subject to cross examination: i. e.; purports to violate the fundamental doctrine of the 'Hearsay Rule.' "

The learned author then proceeds to state the cases in which he thinks "learned treatises" might properly be allowed to be used, but he admits that such use has not been allowed except in one or two jurisdictions. Wigmore on Evidence, Vol. 3, § 1690 *et seq.*

Finally he says: *"That counsel may read to the jury* learned treatises is regarded as allowable in one jurisdiction at least; in effect the treatise is thus used evidentially. In a few jurisdictions a hazy distinction is made between their use as 'illustration' and their use as evidence, the former

being sanctioned. But the general opinion discountenances any such uses." *Ibid,* § 1700: "Printed Hearsay: A hearsay statement does not become competent by reason of the fact that it is printed, even though it appears in the responsible form of a book, and even though such book is a treatise by an author of standard authority on a scientific subject, *such as a medical treatise."* (Italics added.) 22 Corpus Juris, pp. 210, 211.

The editor fortifies his statement with numerous authorities from many states.

"Scientific Books as Evidence." "In an extrajudicial search for the state of professional opinion on a scientific topic, the most natural resort is to the standard treatises on the subject. But the caution of the Courts in admitting opinions which are not based on the observation of the particular facts of the case, the universal requirement that the testimony given to a jury should be under the sanction of an oath, and subject to the test of a cross examination, and the probability of misleading a jury by reading to them general statements, to which they are hardly competent to apply the necessary qualifications and distinctions, have led to a more or less general refusal of the Courts to permit scientific treatises, *particularly medical works* (Italics added) to be proved as standard books of authority, and extracts therefrom to be read as opinion evidence." 11 R. C. L., pp. 588, 589.

The United States Medical Dispensary has been excluded. *Boehringer v. Richards Medicine Co.,* 9 Tex. Civ. App., 284, 29 S. W., 508.

*"Admission cannot be secured indirectly* by asking a medical expert whether extracts read to him from such a treatise are accurate statement of facts." *Davis v. State,* 38 Md., 15; *Marshall v. Brown,* 50 Mich., 148, 15 N. W., 55.

"Nor is it an available expedient to corroborate a medical witness by showing that such a treatise sustains his posi-

tion." *Fox v. Peninsular White Lead Works,* 84 Mich., 676, 48 N. W., 203; *Huffman v. Click,* 77 N. C., 55; note to 22 C. J., 211.

It seems unnecessary to cite further authority.

Counsel for plaintiff was permitted, over objection, to read from a medical book, by Peterson and Haynes, while cross-examining defendant's witness Dr. Wyman, the following: "Q. Assuming that the wound is made on the head—originally incised wounds they heal readily unless the cause of the wound not some deeper injury no further trouble need be apprehended. If, however, the wound is a contused or lacerated one made either by a blow or a fall, it becomes of more or less moment. If the laceration is extensive, the wound is serious for septic substances having probably been carried into the wound at the time of its infliction, and inflammation may result giving pus and its attendant train of evil. A blow may cause a deeper injury than the external wound accounts for. First to consider is the concussion of the brain from the blow and this depends upon the degree for its danger."

To permit this to be read was, as Prof. Wigmore says, to make it evidence; evidence which does not correspond in any particular with the history of the injury to Edward Baker, and its effects, as disclosed by the evidence. There is no testimony of an extensive, contused, or lacerated wound; no evidence of any septic substance having been carried into the wound, at the time of its infliction; no evidence of pus. It is admitted that there never was any paralysis, though it was alleged in the complaint. This sort of examination was continued, and plaintiff's attorney was given permission by the Court to read the book to the jury.

The prejudicial effect of reading such statements to the jury, or in their presence, does not admit of argument. It is patent.

The judgment of the Circuit Court is reversed, and the case remanded for new trial.

Mr. Chief Justice Blease and Messrs. Justices Cothran, Stabler and Carter concur.

Mr. Chief Justice Blease (concurring) :

On the question of the admissibility of scientific books or "learned treatises" in evidence, and the cross-examination of witnesses regarding them and their contents, see two of our cases, *State v. Coleman*, 20 S. C., 441, and *Mitchell v. Leech*, 69 S. C., 413, 48 S. E., 290, 66 L. R. A., 723, 104 Am. St. Rep., 811.