14507

LA COUNT v. GENERAL ASBESTOS & RUBBER COMPANY

(192 S. E., 262)

October, 1935.

*Messrs. John I. Cosgrove* and *J. C. Long,* for appellant, cite:

*Messrs. Mitchell & Horlbeck* and *Stoney, Crosland & Pritchard,* for respondents, cite:

June 30, 1937.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

In this action which was brought under the statute for the benefit of the heirs and distributees of Ray L. La Count, deceased, damages are sought in the sum of $50,000.00. The defendant owns and operates a plant in the County of Charleston for the manufacture of asbestos products; and La Count, it appears, for some years and up until about the middle of 1929, was in its employ and worked in the spinning room where the asbestos was manufactured and woven into asbestos cloth, etc. The plaintiff alleged "that the method of work and process used by defendant corporation, its agents and servants, is and was highly dangerous to the physical wellbeing of its employees, particularly to the throat and lungs and other sensitive organs of the body in that the process of stripping, carding, weaving and spinning said asbestos, asbestos rock dust is given off in such large quantities as ultimately to affect the throat and lungs and other sensitive organs of the body; that as a result of the working of plaintiff's decedent, said Ray L. La Count,

in the presence of said dust, his throat and lungs became so greatly affected and injured that he developed what is known as pneumoconiosis or more properly asbestosis, an affection of the throat and lungs caused by the inhalation of said asbestos dust, so that the said Ray L. La Count became permanently disabled from following any useful work or avocation, was made sick and ill, and shortly thereafter died." It was also alleged that the injuries and death of plaintiff's intestate were due to and caused by the negligent and wanton acts of the defendant, among others, in failing to provide a reasonably safe method for carrying on the work; in omitting to provide proper ventilation or other means of exhausting the asbestos dust from and about the place in which La Count was required to work; in failing to furnish him a mask or other like protection for his throat and lungs, and in not warning and instructing him of the dangerous character of the asbestos dust.

The defendant, answering, denied all acts of negligence and wantonness with which it was charged, and alleged that "the plant of the General Asbestos & Rubber Company was conducted and operated in accordance with the advice of specialists in the manufacture of asbestos products and that every precaution and every safety method which this defendant had been able to ascertain had been employed in the operation of its plant and that if the plaintiff had been affected, as alleged in the complaint, it was occasioned through no fault or negligence of this defendant."

On trial of the case, when all the testimony was in, the company moved for a directed verdict in its favor upon the following grounds: "That there is no testimony in support of the allegation of the complaint that defendant caused La Count to become permanently disabled and die. That the only reasonable inference to be drawn from the testimony is that the proximate cause of his death was edema of the lungs, caused by injection of lipiodol, because there is no material evidence that, if true, would tend to establish the issue in the mind of a reasonable juror. Because only

one reasonable inference can be drawn from the testimony, and that is that La Count's death was due to the injection of lipiodol, and therefore it becomes a question for the Court and not a question of fact for the jury." The motion was granted, and from judgment entered on the verdict the plaintiff appeals.

Pneumoconiosis is defined by Webster as a "disease of the lungs caused by the habitual inhaling of minute mineral or metallic particles, as of coal dust in anthracosis, quartz dust in silicosis, etc." Asbestosis, as it appears from the testimony, is comparatively a new word invented to designate the particular disease due to the inhalation of asbestos dust. It seems that this disease is almost certainly fatal; and the appellant argues that the defendant knew, or in the exercise of due care should have known, the hazards of one working in such dust, and under the duty imposed upon it by law, the company should have adopted such means and methods as were necessary to protect La Count, its employee, against the dangers to which he was thus exposed.

The main question presented for our decision is whether the trial Judge erred in directing a verdict for any of the reasons stated as the grounds of the defendant's motion. In other words, was there any testimony from which it might be reasonably inferred that the defendant was negligent in the operation of its plant and, if so, was such negligence the proximate cause of La Count's death?

The plaintiff, the widow of the deceased, testified that her husband had worked as a spinner with the defendant company from 1925 to 1929, and that he died in January, 1930; that he had not been ill before he came to Charleston, but got sick some time in 1928; that he had shortness of breath and a continual cough; and that he weighed about 125 pounds when he began work there but only about 105 at his death. On the issue of defendant's negligence, Jess Tolbert, a witness for the plaintiff, testified that he worked in the spinning room of the defendant's plant; that there was quite a lot of dust flying around at times in the spin-

ning room, the room in which La Count also worked; that
this dust was everywhere in the room and that when he
and the other workers would leave for the day, their
clothes "looked kind of like we had been in a snow storm";
that the company had no apparatus or machines in the spin-
ning room for the elimination of the dust, and did not
furnish any gas masks in that room for protection against
it; and that, so far as the witness knew, no one in the spin-
ning room had ever been informed that the inhalation of
this dust was dangerous. Ernest Davis, a witness for the
plaintiff, who had worked for the defendant company from
1926 to 1933 in its spinning department along with La
Count for a part of the time, testified to the same effect.

We think that this testimony—although there was very
strong evidence offered by the defendant to the contrary—
tended to establish certain of the specifications of negli-
gence alleged in the complaint as to the operation of the
company's plant, especially with regard to its spinning room
where La Count worked; and if it was also reasonably
inferable from the testimony that such alleged negligence
was the proximate cause of La Count's death, then the
plaintiff was entitled to have the case submitted to the jury.

The evidence as to this issue, the cause of the death of
plaintiff's intestate, we have considered with painstaking
care. It is undisputed that at the time of his death, La
Count was only 27 years of age. He had formerly worked
on a farm, and as a spinner in a cotton mill at Athens, Ga.
The plaintiff stated, as we have already pointed out, that the
deceased was in good health when he began to work for the
defendant about the middle of the year 1925; but that later,
in 1928, he became ill, suffering from shortness of breath
and a severe cough; and that he also began to lose in
weight. Jess Tolbert testified to the same effect. A medical
witness for the company said that when a person is suf-
fering from a dust disease, such as silicosis, asbestosis, or an-
thracosis, the pathological effects on the lungs are largely
fibrosis replacement of the tissues; and that some of the

symptoms which accompany such a disease are a dry cough, usually slight at first, and then more severe; probably shortness of breath, and that the patient usually in the last stages of the desease becomes emaciated. Dr. Lynch, also a witness for the defendant, testified that a certain medical writer on the subject had stated that "medical men in areas where asbestos is manufactured have long suspected the dust to be the cause of chronic bronchitis and fibrosis."

La Count was first treated by Dr. Wild, the company's physician, who testified at the trial as a witness for the defendant. He stated that when he first knew him, the deceased "had a severe cough, spitting up large quantities of sputum"; and that he diagnosed his condition as "chronic bronchitis." He also said that he treated La Count a number of times but got no results from the drugs used, "and some months before his passing, I advised him to go to Roper Hospital to the clinic, to let them work him out with the *x*-ray and try to relieve him."

After plaintiff's intestate was sent to the hospital, he was examined by Dr. Robert Taft, an *x*-ray specialist, who testified on trial of the case as a witness for the appellant. He stated that he made some plates, and on the date of his first examination, dictated to his stenographer his findings in the following report: "December 5th, 1929. Mr. Roy LaCount. X-ray examination of chest. There is a very marked increase in the bronchovascular markings throughout with much fibrosis in both Hilar regions. There is evidence of some deposit behind the 4th rib on the left. These findings are rather typical for tuberculosis. Pneumoconiosis is to be considered." He made a second examination the following month, and reported his findings as follows: "January 27th, 1930, Mr. Roy LaCount. X-ray examination of chest by upright fluoroscope and film. After Tracheal injection of Lipiodol only a small amount of oil has entered and that appears to be only in the lower right Bronchus, none having penetrated to the Bronchioles. The lungs have an appearance similar to that described previously. That is, an increase in

the bronchiovascular markings with much fibrosis and a deposit behind the 4th rib on the left."

Dr. Taft further testified that these findings were from his own readings of the x-ray plates; that he did not consider the deposit behind the fourth rib, referred to in his reports, to be in any way associated with pneumoconiosis, if present; that the injection of lipiodol referred to in the second report of January 27, 1930, was given to better outline the small tracts in the chest, for the purpose of taking pictures, and had nothing to do with the treatment of the disease. He could not remember whether he was present at the time the injection was made, but stated that he found oil in the chest when he x-rayed the patient. To a question whether the pictures as presented by the x-ray showed a disabled condition brought about by inhalation of dust, the witness replied as follows: "Disregarding everything else, do I believe the man was disabled? No, I see no reason to say that he was disabled from that."

La Count died on January 28, 1930, and a formal certificate of death, signed by Dr. John M. Settle, Roper Hospital, was filed with the Board of Health, as required by law. A certified copy of this certificate was introduced in evidence. It contained the following: "The principal cause of death and related causes of importance in order of onset were as follows: Edema of lungs from idiosyncrasy to lipiodol. Pneumoconiosis." Section 5134 of the Code of 1932 provides that "the State registrar shall, upon request, furnish any applicant a certified copy of the record of any birth or death registered under the provisions of this article * * * and any such copy of the record of a birth or death, when properly certified by the State registrar to be a true copy thereof, shall be *prima facie* evidence in all Courts and places of the facts therein stated."

Dr. Settle was called by the defendant as a witness. He stated that La Count was suspected of having bronchiectasis, which is a lung condition impossible to diagnose without injection of lipiodol into the bronchial tract; and that as a

result of the injection, La Count got a severe reaction from the lipiodol and died within twenty-four hours. The witness further testified that no diagnosis of pneumoconiosis was ever reached, but that it was only considered; and that it was put in the certificate, underneath the cause of death, "through error on my part; it should not have been there at all. It was a working diagnosis, but there wasn't any diagnosis."

On cross examination, Dr. Settle stated that he would not say that lipiodol was the sole cause of La Count's death; but he did express the belief that "he would have been living today except for the lipiodol." We think that the jury might have reasonably inferred from this testimony that the sensitivity of La Count to iodine was only a concurring cause of his death. At any rate, we are of opinion that it made a question of fact for them. Under Section 5134 of the Code, the death certificate, as we have said, was *prima facie* evidence "of the facts therein stated." This certificate contained as a fact that one of the causes of La Count's death was "pneumoconiosis." *Prima facie* evidence is "evidence sufficient in law to raise a presumption of fact or establish the fact in question unless rebutted." Webster. The respondent contends that the presumption of fact here raised was rebutted and completely destroyed by the testimony of Dr. Settle, that pneumoconiosis as a cause of the death of La Count was put in the certificate through error on his part and should not have been put there at all. Even conceding this to be true, we think, nevertheless, that there was other evidence in the case which required the submission of the issue to the jury: The history and surroundings of La Count's employment; the testimony of lay witnesses that the disease came upon him a few years after he began work in the spinning room, and manifested itself in shortness of breath, a continual cough, and a loss of weight; the testimony of a medical witness to the effect that these are symptoms of a mineral dust disease, such as asbestosis; the x-ray reports of Dr. Taft;

and the record of the case on the hospital chart, made and kept during the last illness of La Count, which showed, both as to the preliminary and the final diagnosis, that one of the causes of death was pneumoconiosis—although Dr. Settle testified that it was put on the chart purely for Dr. Smith, who at the time was studying pneumoconiosis.

Upon consideration of the entire record, we are satisfied that the trial Judge was in error in directing a verdict as he did. It is true that strong testimony was offered by the respondent in support of its contentions. Still, under all the evidence, we think it was for the jury to say whether or not the alleged negligence of the defendant was a proximate cause of La Count's death.

The remaining questions relate entirely to the exclusion of testimony. When Dr. Lynch, a witness for the defendant, was on the stand, he admitted that he, in collaboration with Dr. Smith, had written and published two articles on the subject of asbestosis. He was cross examined thereabout, and the articles were then offered in evidence but were excluded by the Court. On cross examination of J. W. Fehnel, also a witness for the company, he too admitted the publication by him and others of a joint report on the subject of the effects of the inhalation of asbestos dust on the lungs of asbestos workers, but claimed that he had nothing to do with the medical statements appearing therein. The trial Judge permitted the witness to be examined with reference to the report, but refused to admit it in evidence.

Counsel for the appellant contends that it was proper, not only to cross examine Dr. Lynch and Mr. Fehnel in regard to articles on the subject of asbestosis which had been prepared by them, but to put such publications in evidence for the purpose of impeachment; that is to say, "to contradict, modify and exhibit to the jury inconsistencies in the statements of these witnesses on the stand with those appearing in their published articles."

It is well settled by our decisions that, ordinarily, medical books are not admissible in evidence to be read to the Court and to the jury, except in certain cases allowed by statute. See *Edwards v. Union Buffalo Mills Co.*, 162 S. C., 17, 159 S. E., 818, 820; *Baker v. Southern Cotton Oil Co.*, 161 S. C., 479, 159 S. E., 822; *Mitchell v. Leech,* 69 S. C., 413, 48 S. E., 290, 66 L. R. A., 723, 104 Am. St. Rep., 811. In the *Edwards case,* the question is fully discussed by Mr. Justice Bonham; and he there quotes Mr. Wigmore as saying that the only legitimate reason which has been advanced for prohibiting the use of learned treatises in evidence, "is that such offer of evidence purports to employ testimonially a statement made out of Court by a person not subject to cross examination."

In the case at bar, the witnesses above named were produced by the defendant as experts; each of them, as we have said, had prepared and published, in collaboration with another or with others, articles or a report dealing with a matter about which he was being examined. In these circumstances, we think that such articles and report were admissible in evidence for the purpose stated by counsel for the appellant—for, certainly, the witness was bound by the statements contained in any such publication prepared by him to the extent that the jury should decide under all the facts of the case. It seems clear, therefore, that the trial Judge was in error in excluding them. We are of opinion, however, that such error was harmless, as the Court permitted counsel for the plaintiff to fully cross examine these witnesses as to such articles, and the jury was thereby placed in possession of their contents.

The judgment of the Circuit Court is reversed, and the case remanded for a new trial.

MESSRS. JUSTICES CARTER, BONHAM, BAKER and FISHBURNE concur.